605 S.E.2d 100 (2004)
269 Ga. App. 705
In the Interest of S.A.B., a child.
No. A04A1168.
Court of Appeals of Georgia.
September 23, 2004.
*101 Danny C. Griffin, Colquitt, for appellant.
Thurbert E. Baker, Attorney General, William C. Joy, Shalen S. Nelson, Senior Assistant Attorneys General, Laura W. Hyman, Assistant Attorney General, Hall & Williamson, Lauren H. Williamson, Albany, for appellee.
ADAMS, Judge.
The juvenile court terminated the natural mother's parental rights to S.A.B. The mother appeals, claiming that the evidence, absent inadmissible hearsay and improper opinion testimony, was insufficient to support the juvenile court's ruling. For the reasons which follow, we disagree and affirm.
On appeal of a juvenile court's order terminating a parent's rights in his or her child, we do not weigh the evidence or determine witness credibility, and we view the evidence in a light most favorable to the juvenile court's order and determine whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights should have been terminated.
(Citation and punctuation omitted.) In the Interest of G.B., 263 Ga.App. 577(1), 588 S.E.2d 779 (2003).
Viewed in this light, the evidence shows that following an August 20, 1998 hearing, the juvenile court found the mother's children, S.L.B. (age sixteen), L.J.B. (age eleven), and S.A.B. (age nine), to be deprived and ordered that the children be placed in the temporary custody of the Georgia Department of Human Resources by and through the Early County Department of Family and Children Resources (the "Department"). Findings in this order, which was not appealed, show that the mother struck L.J.B. with a hickory switch, leaving approximately 47 marks on the child's body.
On September 29, 2003, the Department filed a petition for the termination of the mother's parental rights in S.A.B., and on December 3, 2003, the juvenile court held a hearing on the petition. At the hearing, S.A.B. (now 14) testified that "sometimes, I would be really hungry" when he lived with his mother because there was no food. S.A.B. also remembered that crack cocaine and marijuana were present in the house because he saw his older siblings using these drugs. He denied, however, seeing his mother use drugs, although he did see her drink alcohol. S.A.B. saw his mother hit his sister "about a hundred times" with a switch and recalled that his sister's beating was the reason he was removed from his mother's house.
After S.A.B. was removed from his mother's custody he was placed in two foster homes and a group home, and he visited with his mother approximately once a month during this time. S.A.B. then lived at the Georgia Baptist Children's Home for approximately four years, and he testified that during this period his mother came to visit "two or three times." S.A.B. did not recall his mother visiting him at all during his last two years at the children's home, although she did send him several letters. In August 2001, S.A.B. moved into the home of his foster father, and he did not see his mother or receive telephone calls from her while in the care of his foster father. S.A.B. testified that being in foster care for almost six years made him "pretty angry," and he wanted to be adopted "so that I can have a home that I can call ... mine." S.A.B. wanted his mother's parental rights terminated so that he could be adopted by his foster father.
Marlies Brown, S.A.B.'s case manager, testified that the mother failed to comply with the Department's case plans for reunification. The mother failed to submit to a number of drug screening tests. The mother also failed to attend required anger management counseling with her children. The mother told Brown that she had "overdosed" more than one time, and was hospitalized in 1999 or 2000 after one of these occasions. The mother visited S.A.B. only three times in 2001, once in 2002, and not at all in 2003.
Ruth Ann Davis, the program coordinator at the children's home, testified that S.A.B. had an anger control problem and academic difficulties when he came to the home in 1999. Davis further testified that she still sees S.A.B. on a daily basis, that he has a stable life with his foster father, has been *102 making very good grades in school, and is "developing by bounds." According to Davis, S.A.B. has expressed his wish to be adopted, and in her opinion S.A.B. would be emotionally devastated if his mother's parental rights were not terminated.
S.A.B.'s mother admitted that she never completed her anger management courses. She also acknowledged that she did not visit S.A.B. in the year before the termination hearing, although she explained that she worked and she could not "take off every Friday just to go eight hours to drive and see my child for one hour." She agreed that S.A.B. was better off today than when he was living with her.
Before terminating a parent's rights, a juvenile court must employ a two-step test:
First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.
(Footnote omitted.) In the Interest of T.B., 249 Ga.App. 283, 285-286(1), 548 S.E.2d 45 (2001).
The mother contends that the trial court erroneously relied on Brown's hearsay testimony and Davis's improper opinion testimony, and that without the improper testimony there was no clear and convincing evidence that continued deprivation would harm S.A.B. This argument addresses the fourth factor required to establish parental misconduct or inability, which is clear and convincing evidence that "continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child." OCGA § 15-11-94(b)(4)(A)(iv).
Notwithstanding the mother's objections to Brown's testimony, we are not required to reverse the termination of her parental rights. The mother objected when the Department asked Brown if she knew how many mental health appointments the mother failed to attend, and Brown did not answer the question. The juvenile court allowed Brown to testify to what her records showed based on the business records exception, although stating that "I think [Brown is] relying upon someone else's determination as to whether [the mother] was in attendance or not." However, when questioning resumed, Brown never testified to the number of mental health appointments the mother missed, but indicated that it was the mother's failure to provide verification of attendance that caused the Department to consider that the mother failed the plan goal. Thus, the mother does not show Brown gave hearsay testimony as to the mother's attendance of her mental health appointments.
The mother also objected on grounds of hearsay when the Department asked Brown about S.A.B.'s "educational level," contending that although Brown was testifying from her records, the testimony remained hearsay. The trial court eventually allowed this testimony based on the business records exception. We agree that the Department never established a foundation for admission of Brown's testimony concerning S.A.B.'s educational records sufficient to offer the evidence for purposes of showing the truth of the matters asserted by those records. These documents were shown to be retained in the ordinary course of business of the Department, but this is not a sufficient foundation to establish the authenticity of the documents' contents as they were not prepared by the Department. See Moore v. State, 154 Ga.App. 535, 540, 268 S.E.2d 706 (1980) (letters sent by Veterans Administration to Department of Family and Children Services were not sufficient to prove issuance of benefits asserted by the letters where it was also not shown that the letters were factual documents routinely sent to DFACS at the time they were made). And the Department did not establish that the records were the routine factual documents of the *103 creating party. See Id. at 538-539, 268 S.E.2d 706.
Although a portion of Brown's testimony was hearsay, the juvenile court indicated that it would not place probative value on hearsay testimony. "The trial judge is presumed to know the law and to be capable of separating admissible grains of evidence from inadmissible chaff." (Citation and punctuation omitted.) In the Interest of C.M., 258 Ga.App. 387, 388(2), 574 S.E.2d 433 (2002). Furthermore, Brown's hearsay testimony was duplicative of Davis's testimony as to S.A.B.'s initial educational problems and eventual improvement. Even if the juvenile court had improperly considered the hearsay evidence, such consideration will not constitute reversible error where "the evidence introduced at the hearing, not considering the [inadmissible hearsay], was sufficient to support the findings and conclusions of the juvenile court judge." In the Interest of M.A.C., 244 Ga. 645, 655(4), 261 S.E.2d 590 (1979). As shown below, the evidence was sufficient to support the juvenile court's findings absent Brown's hearsay testimony.
The mother also claims the trial court relied on Davis's testimony, who she claims was not tendered as an expert witness and improperly opined on the "ultimate issue" of whether S.A.B. would be harmed if the parental relationship was not terminated. The mother did not object to Davis's testimony. Accordingly, "[t]his argument was never made in the juvenile court and, therefore, cannot be raised on appeal." (Citation omitted.) In the Interest of C.S., 236 Ga.App. 312, 315(2), 511 S.E.2d 895 (1999).
Disregarding Brown's hearsay testimony, clear and convincing evidence supported the juvenile court's finding that S.A.B.'s continued deprivation would cause serious physical, emotional, or moral harm to the child. S.A.B. had developed a positive relationship with his foster parent and expressed his desire to be adopted. Absent termination, S.A.B. would remain in a foster relationship against his express wishes, and S.A.B. testified to the anger he felt at being in foster care and his need for a permanent home. "The juvenile court was authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the [child]." (Punctuation and footnote omitted.) In the Interest of M.C.L., 251 Ga.App. 132, 136(1)(b), 553 S.E.2d 647 (2001). Compare In the Interest of B.F., 257 Ga.App. 76, 80, 570 S.E.2d 385 (2002) (lack of testimony that child was suffering from being in foster care or that child would suffer if he did not find permanent placement cited as factor in reversing juvenile court's termination of mother's parental rights). Furthermore, Davis, who possessed a masters degree in psychology, testified that based on her professional and personal relationship with S.A.B., the failure to terminate the mother's parental rights would be detrimental and immediate, including "[t]he anger problems, the school problems, his academic grades would go downhill." In view of the foregoing, the juvenile court did not err in finding that "the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child." The juvenile court's termination of the mother's parental rights to S.A.B. must be affirmed.
Judgment affirmed.
RUFFIN, P.J., and ELDRIDGE, J., concur.